RILEY A. CLAYTON
Nevada Bar No. 005260

**HALL JAFFE & CLAYTON, LLP**
7455 WEST WASHINGTON AVE., SUITE 460
LAS VEGAS, NEVADA 89128
(702) 316-4111
FAX (702) 316-4114

Attorney for Defendant

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| KATHLEEN GORRELL and DANIEL GORRELL,<br><br>Plaintiffs,<br><br>vs.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, a foreign corporation authorized to do business in Nevada; DOES I through X and ROE Corporations or Business Entities I through X, inclusive,<br><br>Defendants. | **CASE NO.: 2:08-cv-1757-RLH-RJJ**<br><br>**STATE FARM'S REPLY TO PLAINTIFFS' MARCH 10, 2010, OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**<br><br>**ORAL ARGUMENT REQUESTED** |

Defendant, State Farm Mutual Automobile Insurance Company ("State Farm"), by and through its counsel, Hall Jaffe & Clayton, LLP, hereby submits this Reply to Plaintiffs' March 10, 2010 Opposition to Motion for Summary Judgment (Doc. 27).

As set forth herein, Plaintiffs have utterly failed to bring forth specific facts, supported by admissible evidence, to potentially defeat summary judgment in State Farm's favor on all claims. *See, e.g.,* Fed. R. Civ. P. 56(e) and LR 56-1. Rather than complying with the specific mandate of producing actual evidence, Plaintiffs simply fill their Opposition with unsupported allegations. Because there is no admissible evidence to defeat State Farm's well-documented and undisputed set of controlling/material facts, summary judgment should be granted in State Farm's favor on all claims.

Moreover, Wyoming substantive law applies to this case and Plaintiffs' unsupported and wholly misleading representations to the contrary are insufficient to change that outcome. Therefore, on

this additional level, State Farm submits that all claims, which are pled under Nevada law and which do not have a Wyoming equivalent, should be summarily dismissed.

Furthermore, Plaintiffs did not (and cannot) establish that the value of their claims for soft tissue neck and back strains/sprains exceed the amounts already received from the tortfeasor and under their MPC and UIM coverages. The medical records confirm that Plaintiffs reached maximum medical improvement for their soft tissue injuries as of July 1, 2007. Similarly, Plaintiffs did not (and cannot) refute the undisputed fact that State Farm had a "fairly debatable" basis for discontinuing further payments under MPC and declining to extend UIM benefits, which eliminates any potential for extra-contractual recovery. State Farm relied upon the medical opinions of Plaintiffs' own treating physicians as well as its own experts prior to making the decision to decline further benefits. In fact, Plaintiffs' own "bad faith" expert admits that controlling issues driving this case are "fairly debatable." Likewise, Plaintiffs did not (and cannot) produce a single shred of evidence to support a triable issue regarding State Farm's purported "evil-intent" or conduct rising to the level of a "crime," which must be demonstrated under Wyoming law to establish punitive damages. As such, State Farm is entitled to summary judgment on the remaining extra-contractual (bad faith) claims and the punitive damages claim.

DATED this 7th day of May, 2010.

HALL JAFFE & CLAYTON, LLP

By [signature]
RILEY A. CLAYTON
Nevada Bar No. 005260
7455 West Washington Ave., Suite 460
Las Vegas, Nevada 89128
Attorney for Defendant

## *MEMORANDUM OF POINTS AND AUTHORITIES*

## I. LEGAL ARGUMENT

### A. Plaintiffs Have Utterly Failed To Submit Admissible Evidence To Defeat State Farm's Motion For Summary Judgment.

Although Plaintiffs' Opposition makes a brief reference to the legal standard imposed upon the non-moving party under Fed. R. Civ. P. 56 (Opp. p. 6, lns. 5-15), the Opposition utterly fails to do what

that rule and the local rule actually require. As this Court is aware, the requirements of Fed. R. Civ. P. 56(e)(2) are mandatory. Rule 56(e) expressly states that the non-moving party **"must--**by affidavit or otherwise as provided in this rule--set out specific facts showing a genuine issue for trial," and if the opposing party does not so respond, summary judgment shall be entered against that party. *Id.* Moreover, LR 56-1 expressly states that the party, in opposing a motion for summary judgment, must "cite[] the particular portions of any pleading, affidavit, deposition, interrogatory, answer, admission, or other evidence upon which the party relies," to establish material facts relating to the disposition of the motion. *Id.* These rules are not suggestions; rather, they are the mandatory requirements that must be satisfied to avoid having summary judgment entered. *See, e.g., Celotex v. Catrett*, 477 U.S. 317, 324 (1986)(once moving party presents *prima facie* showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to show, by affidavit or otherwise, the existence of a genuine issue of material fact for trial); *Miller v. Glenn Miller Productions*, 454 F.3d 975, 987 (9th Cir. 2006)(facts contained in affidavits opposing motion for summary judgment must be admissible at trial); *S.E.C. v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007)(self serving affidavits must amount to more than mere conclusions or unsupported inferences or they may be disregarded by the Court).

In reviewing Plaintiffs' Opposition, it takes little effort to determine that Plaintiffs have not even remotely complied with the evidentiary mandates of Rule 56(e) and LR 56-1.[1] For instance, in their "Facts" section of the Opposition, Plaintiffs reference and list-out 37 purported "Facts." (Opp. pp. 2-5). However, the overwhelming majority of those "facts" are unsupported by any affidavit, deposition, interrogatory answer, disclosure document, or any other type of evidence required under the rules. **These unsupported "facts" are found in Plaintiffs' numbered paragraphs: 1-6; part of 7; 8-15; 19-28; 30-32**.

With the foregoing in mind, then, the only "facts" in Plaintiffs' Opposition, which are (arguably) supported with a citation to the evidentiary record, are the following:

[1] Notably, there are no Exhibits attached to Plaintiffs' Opposition, even though Exhibits are referenced in the Opposition. State Farm understands, however, that Exhibits were submitted by Plaintiffs with their prior Opposition to Motion for Summary Judgment, which Opposition was subsequently withdrawn.

* No. 7 - "The terms of the insurance contract provided Plaintiffs' medical payments coverage limits of $100,000 per person as well as underinsured motorist coverage in the same amount of $100,000."

* No. 16 - "On or about October 8, 2006, Dan and Kathleen were sitting at a red turn arrow on Sunset Road, Henderson, Nevada, awaiting a green signal onto Marks Street."

* No. 17 - "Plaintiffs were struck, head-on, by an intoxicated driver, Juan Monroy. Monroy swung wide on his turn into the oncoming lane, striking Dan and Kathleen head-on."

* No. 18 - "Plaintiffs were injured as a result of the event, and received numerous injuries, some of which were medically determined to be permanent."

* No. 29 - "In and around that time, Dan and Kathleen settled with Juan Monroy's insurance company for the limits of the insurance policy on the adverse vehicle."

* No. 33 - "Due to the fact that their medical bills and disability rating value exceeded the amounts of the adverse driver's coverage, demand was made upon the Underinsured Motorist portion of the policy of insurance."

* No. 34 - "Defendant responded on April 23, 2008, indicating there was a coverage dispute."

* No. 35 - "On May 1, 2008, State Farm reinstated (sic) the previous reservation of rights on the claim. The dispute arose because of the settlement with Monroy without their permission based upon Wyoming law."

* No. 36 - "On May 9, 2008, State Farm denied the claim indicating the Gorrells had been fully compensated."

* No. 37 - "On June 12, 2008, State Farm refused to pay for medical bills which were incurred as a result of the accident."

Importantly, the overwhelming majority of the foregoing "facts,"or portions thereof, are not disputed either, and really do not control the outcome of this case. Again, State Farm agrees that the MPC and UIM policy limits are $100,000 each person (No. 7); that the Plaintiffs were involved in an automobile accident in Henderson with Juan Monroy (No. 17, 18); that Plaintiffs settled with Monroy for $15,000 each (No. 29); that a UIM demand was made upon State Farm (No. 33); that State Farm had a coverage dispute under Wyoming law regarding the enforceability of its "consent to settlement" provision, which dispute was subsequently resolved in Plaintiffs' favor (Nos. 34 and 35); and that State Farm ultimately discontinued MPC payments after paying over $14,000 to Daniel and over $7,000 to Kathleen, and declined UIM coverage given the amounts previously recovered (Nos. 36 and 37).

Recall, again, that State Farm went to great lengths to establish the non-existence of a dispute with respect to the material facts of this litigation. Indeed, State Farm properly supported its motion with specific citations to the Gorrells' and their experts' deposition testimony, answers to interrogatories, Plaintiffs' medical records, expert reports, and other evidence so that there would be no doubt regarding

what the **actual evidence** truly is. Notably, State Farm's well-supported facts were not controverted by Plaintiffs in their Opposition. To briefly reiterate, these undisputed, material facts[2] are:

* Plaintiffs' Ford F-250 sustained only minor damage in the accident.

* Plaintiffs declined medical treatment at the scene, and drove all the way back to their home in Wyoming after the accident.

* On the first date of their medical treatment, Kathleen only reported minor aches and pains (a 2-3 out of 10 on pain scale); and Daniel reported only minor problems as well.

* Both Plaintiffs have a significant pre-existing history of neck and back problems, and were receiving treatment within months and weeks of the accident.

* State Farm began to receive, review and pay Dr. Steffensmeier's chiropractor bills under the MPC portion of the policy.

* Dr. Steffensmeier responded, in writing, to State Farm's request for treatment and provided an expected date for reaching maximum medical improvement ("MMI"). Dr. Steffensmeier opined that both Kathleen and Daniel would reach MMI by **July 1, 2007**.

* State Farm arranged to have the Plaintiffs' records reviewed by an expert to assess causation/apportionment and MMI issues.

* On August 7, 2007, Daniel R. Staight, D.C., a licensed practicing Wyoming chiropractor, provided his expert medical reviews, and concluded, among other things, that Plaintiffs reached MMI as of July 1, 2007, and that any ongoing problems were associated with their pre-existing conditions.

* After State Farm received the expert records reviews from Dr. Staight, State Farm paid all outstanding medical bills up through the first part of August 2007, informed the Plaintiffs and their providers that there would be no further payments, and provided them with copies of the expert reports.

* The Plaintiffs' own medical records and the Plaintiffs' deposition testimony establish multiple additional "incidents" where both of the Plaintiffs, slipped, tripped, fell, traveled, and were involved in a significant automobile accident on and icy Interstate 80 (the 180 degree spin/smash), etc, all of which created additional pain/problems for Plaintiffs.

* Plaintiffs settled with the adverse driver, Juan Monroy, by receiving $15,000 each. In addition, Daniel and Kathleen received $14,178.10 and $7,119.50 in MPC benefits from State Farm, **making Daniel's and Kathleen's recovery $29,178.10 and $22,119.50, respectively, for their soft-tissue, neck and back injuries**.

* On or about April 16, 2008, Plaintiffs subsequently demanded the full UIM policy limit under the subject policy.

* In response to the demand, on or about May 7, 2008, State Farm evaluated the demand package, the file materials, and other information and determined the Plaintiffs had been fully compensated through the prior payments; in other words, State Farm concluded that the potential UIM claims, which were soft tissue in nature, did not have a value beyond the applicable offsets.

* Plaintiffs' "impairment" rating chiropractor, Dr. Jeffrey States **admits**: (1) the Plaintiffs failed to inform him of certain prior neck/back conditions, problems and treatment; (2) **he did not review any medical records pre-dating**

[2]In its motion for summary judgment, these same facts cite to specific Exhibits attached to the motion.

**the subject accident**; (3) the Plaintiffs **failed to inform him of the subsequent incidents and accidents**, including an automobile accident on Interstate 80;

* Plaintiffs' treating chiropractor **admits** that he was familiar with insurance companies' written requests for information regarding the care and treatment of his patients and understood that State Farm could reasonably rely upon his written opinions regarding when Plaintiffs would reach MMI.

* Plaintiff's "bad faith" expert **admits**: (1) that the controlling extra-contractual issues in this case are, in fact, "fairly debatable;" (2) that the nature/extent of Plaintiffs' injuries and treatment are "fairly debatable;" and (3) there is no evidence of any malicious or evil intent on behalf of State Farm, thereby eliminating punitive exposure.

Again, the foregoing are the **undisputed facts** in this case. Therefore, the Court should conclude that Plaintiffs' claims do not warrant further benefits under the MPC and UIM policies, and/or at the very least, do not trigger a triable issue of bad faith or punitive damages. Therefore, summary judgment is proper on all claims

**B. Wyoming Substantive Law Applies To This Case.**

Plaintiffs have mislead this Court by arguing that Wyoming substantive law should not apply to the facts of this case. (Opp. pp. 6-11). In an effort to manufacture this argument, Plaintiffs: (1) make unsupported "factual" assertions regarding the relevant contacts with Wyoming; (2) cite to no law supporting their position; (3) fail to distinguish (or even challenge) the controlling law regarding conflicts of law issues; and (4) urge the Court to consider factors that are not even part of the conflicts of law inquiry. As set forth below, the Court should readily recognize that the actual and supported facts,[3] and the controlling law on this issue, unequivocally establish that Wyoming law applies to this case.

Plaintiffs Opposition fails to include a single citation to the evidentiary record to support the purported "facts" upon which Plaintiffs rely to suggest that Nevada law should apply. Frankly, the preceding sentence takes on greater significance once the Court realizes that State Farm, after receiving the prior/withdrawn Opposition to the motion for summary judgment, sent Plaintiffs counsel a letter, which pointed out the false nature of Plaintiffs' representations regarding the Wyoming contacts. (See email dated March 9, 2010, attached hereto as Reply Exhibit "A"). As that letter explains, the "true" facts, which were supported by the deposition testimony of the Plaintiffs, concerning the conflicts of law

---

[3] Importantly, State Farm "called Plaintiffs on the carpet" when it received the March 5, 2010, opposition to the motion for summary judgment, which grossly mischaracterized the "facts" surrounding the choice of law issue. Plaintiffs withdrew that opposition. Unfortunately, the present Opposition continues with this same pattern.

issue are as follows:

Q: Actually, how long did you and your spouse live in Nevada?
A: We moved here and went to work July of '97. **And we left here April of 2006**.

(Depo. Daniel Gorrell, attached as Reply Exhibit "B," p. 16, lns. 3-6). Daniel's testimony continues:

Q: Where do you work?
A: I'm back at FMC.
Q: How long have you been working for FMC?
A: **Three years, almost three and a half.** [Depo date of August 24, 2009, less nearly 3 ½ years, puts Daniel working at FMC in Wyoming in April 2006][portion in brackets added].

(Reply Exhibit "B", p. 20, lns. 21-24). Then, with respect to the procurement of the subject policy, Daniel states:

Q: Is there any reason or understanding as to why the insurance policy that's involved in this present case is a Wyoming insurance policy versus a Nevada policy?
A: I'm trying to think of when they actually changed our address, **because we left here in April of '06.** We bought the truck in August of '06, and I imaging that's when it switched to Wyoming, to our Wyoming agent.
Q: Okay. So you moved back to Wyoming, you obtained the truck that was involved in the accident, and they you got a policy that was issued in Wyoming through a Wyoming agent?
A: Yes, sir.
Q: Okay. Then you were back down in Nevada when the accident happened?
A: Yes.
Q: All right. Did you have – let me back up. When did you purchase the Ford truck that was involved in the accident?
A: In August of '06.
Q: Where did you buy that?
A: I can see the place.
Q: Do you remember which state it was?
A: Yeah, it was in Wyoming. It's in Rock Springs.
Q: **So after you purchased the truck, then you went to the State Farm agent and said, "Hey, we just bought a new truck?"**
A: **Right. I think we already had our insurance moved to Wyoming at that time, because I had it, a Dodge Pick-up and traded in on it.**

(Reply Exhibit "B," p.27, lns. 9-25; p. 28, lns. 1-15). According to the foregoing testimony, the subject policy did not initiate in August 2006 (as Plaintiffs suggest, Opp. p. 7, lns. 16-17); rather, the Gorrells had already changed their Nevada auto policy to a Wyoming auto policy when they returned to Wyoming in April 2006, and then they simply designated a new vehicle on the then-existing Wyoming policy to cover the Ford F250, which replaced the prior Dodge pickup! Daniel's testimony continues:

Q: Take me to the circumstances approximately an hour before being involved in the accident. What's going on in the Gorrell family?
A: I can't tell you where we were.
Q: Fair enough.
A: We decided to – we had come down, we were trying to sell our house. I was trying to remember exactly what we came down for – oh—the movers were going to pack everything up and move it, and we had to be here. So the house

was a mess. We decided to go out for dinner. And we decided on an In-N-Out, since they don't have those in Wyoming. So we headed that way.

(Reply Exhibit "B," p. 73, lns. 21-25, p. 74, lns. 1-7).

As set forth from Daniel's actual testimony, and as pointed out in the supported/documented facts found in State Farm's motion for summary judgment, Daniel had the State Farm auto policy issued in Wyoming when he first moved there in April 2006; Daniel had his covered vehicles licensed and garaged in Wyoming where he was living since April 2006; Daniel was working full time in Wyoming since April 2006; Daniel bought the subject policy from a Wyoming agent; Daniel paid his premiums in Wyoming; and the policy was issued pursuant to Wyoming's insurance laws.

Kathleen's actual testimony also establishes the true nature of the Plaintiffs' Wyoming contacts.

A:  In March of 2006, our daughter-in-law was killed in a car accident.
Q:  I'm sorry to hear that as well.
A:  We had a 2-year old grandson and a 5-month old granddaughter. **We left Nevada, moved back to Wyoming to help our son take care of his family**.
Q:  Is that what prompted the move from Las Vegas back to Wyoming?
A:  Yes.
Q:  Were you one of the primary care givers of those two children after the passing of their mother?
A:  While our son was working, yes.
Q:  Sure.
A:  We lived with him. And when he got home at night, he took care of them.
Q:  How long did that arrangement – were you living in that particular arrangement?
A:  **We lived with him for six months**.
Q:  **Okay. Where did you live after that six month period**?
A:  He lived in Rock Springs, and **we moved to Green River.**
Q:  **Did you continue to care for these younger children while you lived in Green River**?
A:  **Yes, sir**.
Q:  **Would he bring them to you every day**?
A:  **Yes**.

(Depo. Kathleen Gorrell, attached as Reply Exhibit "C", p. 28, lns. 12-25; p. 29 lns. 1-13). Again, Kathleen's testimony confirms that the Plaintiffs' return to Wyoming was not temporary; rather, it was a decision to permanently remain in Wyoming so that she could take care of her grandchildren after their mother's passing. They resided in Wyoming, not Nevada, from April 2006 to the present; were insured in Wyoming since that time; and had the subject of the insurance, i.e., their vehicles, licensed and garaged there.

A federal court sitting in diversity applies the forum state's choice-of-law rules. *Rio Properties, Inc. v. Stewart Annoyances, Ltd.* 420 F. Supp.2d 1127, 1130-31 (D. Nev. 2006). In cases involving insurance coverage issues, the Nevada Supreme Court holds that the state whose law is applied must have a substantial relationship to the transaction. *See Sotirakis v. USAA*, 106 Nev. 123, 126, 787 P.2d 788, 790 (1990); *Williams v. United Serv's. Auto. Ass'n*, 109 Nev. 333, 334-35, 849 P.2d 265, 266 (1993). The factors for determining which state has the more "substantial relationship" are: (1) the place of contracting; (2) the place of the negotiation of the contract; (3) the place of performance; (4) the place of the subject matter of the contract; and (5) the citizenship of the domicile or residence of the parties. *Id.*

Notably, **there is not a single citation to any law contrary to the foregoing proposition, and there is not even an attempt to distinguish those cases legally or factually in the Opposition**. Perhaps Plaintiffs' failure to do so is an implicit recognition that the law on this issue is, in fact, well-settled. Again, the undisputed and supported evidence, which relates to the *Sotirakis* factors, establishes that: (1) the place of contracting was Wyoming because the insurance policy was issued in Wyoming and was issued to the Gorrells, who were Wyoming residents; (2) the place of negotiation/purchase of the policy occurred in Wyoming at a local Wyoming State Farm sales agent's office; (3) the place of performance occurred in Wyoming as the premium payments were made there and the claim was handled in Wyoming (and to some extent, Colorado); and (4) the subject matter of the insurance, the Ford F-250, was licensed, registered, and garaged in Wyoming. As further evidence that Wyoming law should apply, the policy includes multiple references establishing that it is to be construed consistently with and in light of the minimum insurance requirements imposed by the "Wyoming Motor Vehicle Safety Responsibility Act." (Motion for Summary Judgment Exhibit "A"). Although the subject vehicle was driven in Nevada at the time of the accident, the Nevada Supreme Court has held that the location of where the accident occurred has very little to do with establishing which state has the more substantial interest. *Sotirakis*, 106 Nev. at 125. Rather, the more important factors involve the place of negotiation, the place of contracting, and the location where the subject matter of the insurance was set to be insured. *Id.*

Plaintiffs argue, contrary to *Sotirakis,* that the place where the accident occurred is one of the most important factors. (Opp. p.7, ln. 23 - p.8, ln. 6). Again, this argument has been resoundingly rejected by the Nevada Supreme Court, and State Farm requests that this Court do so here as well. *See Sotirakis,* 106 Nev. at 125 (holding that the contacts with the state where the accident occurred are "fortuitous."). Moreover, Plaintiffs mistakenly and repeatedly argue that "venue" is somehow part of the conflicts of law analysis (Opp. p. 7, ln. 2; p.9, ln. 24), when, in fact, it is not. Indeed, State Farm is not contesting venue in this case, noting that State Farm has presented its dispositive motion without raising "venue" as a defense. Thus, this Court should not be persuaded by Plaintiffs' incorrect conflicts of law analysis by considering whether "venue" is appropriate, particularly when "venue" is not at issue.

In addition, Plaintiffs' represent (without evidentiary support) that because the Plaintiffs "had not entirely effectuated their relocation" to Wyoming, Plaintiffs could be determined as residents of Wyoming and Nevada. (Opp. p.9, lns. 16-17). Of course, State Farm recognizes that "residency" is one of the factors outlined in *Sotirakis*, but it is certainly not the controlling factor and is, in fact, outweighed by other *Sotirakis* factors. Interestingly, Plaintiffs admit that they left Nevada in April 2006 with an intention to remain in Wyoming permanently (Opp. p. 9, lns. 22-23), which establishes that they are solely Wyoming residents. Moreover, the uncontroverted and supported facts of this case confirm that Plaintiffs moved to Wyoming in April 2006; Daniel had taken full time employment at FMC in Wyoming in April 2006; Plaintiffs were residing with their son and caring, daily, for the grandchildren in Wyoming since April 2006; and once they left Nevada in April 2006, they intended to remain in Wyoming permanently. Thus, Plaintiffs were Wyoming residents for over six months prior to the subject accident.

And, even assuming that Plaintiffs had a "dual residency," then not only does the residency issue favor Wyoming as much as Nevada, the Nevada Supreme Court still holds that the more important factors involve the place of contracting, the place of performance, the place of negotiation, and the location where the subject matter of the insurance is licensed and garaged. *Sotirakis*, at 126; *Consolidated Generator-Nevada, Inc. v. Cummins Engine Co., Inc.*, 114 Nev. 1304, 1308, 971 P.2d 1251, 1254 (1998)("California bears the most significant relationship to the original contract. The

contracting took place in California, the contract was negotiated in California, and the contract was performed in California.") As such, even if State Farm were to concede that Plaintiffs had a "dual residency," this concession would not detract from the conclusion that Wyoming law applies since their "dual residency" cancels each state out, and the more important factors weigh in favor of applying Wyoming law.

Finally, Plaintiffs seem to (confusingly) argue that it is improper to apply Nevada law because "some of their causes of action are not recognized in Wyoming." (Opp. p.10, lns. 1-2). This argument, likewise, has been rejected by the Nevada Supreme Court on at least two occasions. *See Sotirakis, supra,* and *Williams, supra.* In making a similar argument, which the Nevada Supreme rejected, the court stated:

> Williams argues that the application of California law violates the Nevada public policy that affords insureds an expansive recovery under UIM coverage. **Essentially, he asks for the application of Nevada law simply because it differs from California law. He improperly equates a routine dissimilarity between two states' laws with a violation of a fundamental public policy.** . . .Indeed, in scenarios similar to Williams', **we applied Nevada public policy only where other states' laws would preclude *all* recovery for the injured insured**. *Daniels v. National Home Life*, 103 Nev. 674, 747 P.2d 897 (1987)(**Nevada public policy outweighed the interest of another state, where the application of the other state's law would have completely precluded the insured's widow from recovery**). Conversely, Williams has recovered $300,000 from USAA for his injuries. Thus, although California law precludes Williams' additional recovery, that result does not offend a strong social policy of this state.

*Williams*, 109 Nev. at 336, 849 P.2d at 267. In essence, Plaintiffs are making the same argument here. They simply contend that because there is a difference between Wyoming law and Nevada law (e.g., regarding the unfair claims practices act), Nevada law should apply. However, just like the court recognized in *Williams*, Plaintiffs herein are likewise not left without any recovery. Again, Plaintiffs can still pursue breach of contract and "bad faith" claims under Wyoming law and, as such, they are not "precluded from all recovery"(although the facts in this case have eliminated that possibility). They still have over $85,000 and $90,000 respectively to potentially recover under the MPC policy. They still have $100,000 each to potentially recover under the UIM claim. They can still pursue damages for bad faith. Therefore, because Wyoming still allows Plaintiffs significant potential for recovery and does not preclude them from any recovery, this Court should readily conclude that Wyoming law applies, and that the application of that law does not contravene public policy.

**C. Plaintiffs' Extra-Contractual Claims, Which Are Pled Pursuant To "Nevada" Law, Are Subject To Immediate Dismissal.**

As demonstrated by the foregoing conflicts of law analysis, Wyoming law should apply to this case. As such, a number of Plaintiffs' claims, which are pled pursuant to "Nevada law" should be summarily dismissed via summary judgment. These causes of action include: (1) Plaintiffs' fourth cause of action – violations of Nevada's Unfair Claims Practices Act; (2) Plaintiffs' fifth cause of action – quantum meruit; (3) Plaintiffs' sixth cause of action – bad faith, although better characterized as intentional misrepresentation; (4) Plaintiffs' seventh cause of action – negligent misrepresentation; and (5) punitive damages based upon purported violation of NRS 686.300.

Again, it is uncontroverted that State Farm placed Plaintiffs on notice that Wyoming law would apply to this case and that State Farm intended to defend itself against improperly pled claims that were made pursuant to "Nevada law." This warning came by way of two, separate affirmative defenses, which were filed with State Farm's answer at the inception of the case. Yet despite this warning, Plaintiffs did nothing to save their claims, i.e., timely filing an amended complaint. Moreover, since the deadline for amending pleadings has passed, the Plaintiffs are now precluded from amending their complaint to assert claims under Wyoming law. To that end, because Wyoming law does not recognize claims for violations of the afore-mentioned claims, State Farm requests that summary judgment be entered in its favor and that the Court dismiss all of these "Nevada" claims/causes of action.

**D. Plaintiffs Have Not Provided Any Evidence Pursuant To Fed. R. Civ. P. 56(e) or LR 56-1 To Create A Genuine Issue Of Material Fact Concerning Their Entitlement To Additional Proceeds Under The MPC Or UIM Coverages.**

In Section I.A. of this Reply, State Farm analyzed Plaintiffs failure' to provide the requisite evidence to establish a genuine issue of material fact on any of the issues raised in this case. That analysis is incorporated here. As such, the Court may rightfully conclude that State Farm is not obligated to pay any further contractual benefits to the Plaintiffs. Indeed, State Farm's undisputed evidence regarding the nature and extent of Plaintiffs' (soft tissue neck and back sprains/strains); coupled with the fact that they were treating for the same symptoms within weeks and months prior to the accident, plus the fact that both the Plaintiffs' treating chiropractor and State Farm's expert determined that they would

reach MMI on July 1, 2007, establishes that they are entitled to no further recovery.

With respect to the MPC claim, the outcome of that issue is governed by the language of the Med Pay contract itself in connection with the undisputed facts of this case. The MPC provisions provide:

> We will pay ***reasonable medical expenses*** incurred, for bodily injury, ***caused by accident***, for services furnished within three years of the date of the accident. These ***expenses are for necessary medical***, surgical, X-ray, dental, ambulance, hospital, professional nursing and funeral services, eyeglasses, hearing aids and prosthetic devices.
> * * *
> 6127N AMENDATORY ENDORSEMENT
> * * *
> 4. SECTION II – MEDICAL PAYMENTS – COVERAGE C
>    a. Item 2b under the provision beginning "REASONABLE MEDICAL EXPENSES DO NOT INCLUDE EXPENSES" is deleted.
>    b. The following is added:
>    * * *
>    ***Services are necessary only if*** the services are rendered by a medical provider within the legally authorized scope of the provider's practice and ***are essential in achieving maximum medical improvement for the bodily injury sustained in the accident***.
>    We have the right to:
>    (1) obtain and use:
>       (a) peer reviews; and
>       (b) medical bill reviews
>       of the medical expenses and services to determine if they are reasonable and necessary for the bodily injury sustained. (Emphasis added).

(Motion for Summary Judgment Exhibit "A"). According to the specific language of the policy, State Farm only becomes obligated to pay for medical expenses that the Plaintiffs reasonably and necessarily incur that were caused by accident, and which are essential in achieving maximum medical improvement. Thus, because the undisputed evidence, coming not only from State Farm's expert, but also from Plaintiffs' own treating chiropractor, establishes that the Plaintiffs achieved "maximum medical improvement" by July 1, 2007, further MPC benefits are not owed. As such, this Court should grant summary judgment in State Farm's favor on the MPC claim.

With respect to the UIM claim, a similar analysis applies. Based upon the information available, State Farm concluded that the potential value of Plaintiffs' claims did not exceed the applicable offsets, i.e., **$29,178.10 for Daniel and $22,119.50 for Kathleen**. As such, State Farm determined that Plaintiffs' claims did not trigger UIM coverage. Under the terms of the UIM coverage, State Farm is only obligated to extend UIM benefits under certain circumstances:

> 6127N AMENDATORY ENDORSEMENT
> * * *

5. **SECTION III – UNINSURED MOTOR VEHICLE – COVERAGE U AND UNDERINSURED MOTOR VEHICLE – COVERAGE W**

* * *

b. The second paragraph under **UNDERINSURED MOTOR VEHICLE – COVERAGE W** is changed to read:
We will pay compensatory damages for ***bodily injury*** an ***insured*** is legally entitled to collect from the owner of an ***underinsured motor vehicle***. The ***bodily injury*** must be sustained by an ***insured*** and caused by accident arising out of the operation, maintenance or use of an ***underinsured motor vehicle***.

* * *

f. The provision **Deciding Fault and Amount – Coverage W** is replaced by:

* * *

1. a. The ***insured*** and we must agree to the answers to the following two questions:
   (1) Is the ***insured*** legally entitled to collect damages from the owner or driver of the ***underinsured motor vehicle***?
   (2) If the answer to 1.a.(1) above is yes, then what is the amount of damages that the ***insured*** is legally entitled to collect from the owner or driver of the ***underinsured motor vehicle***?

   b. If there is no agreement on the answer to either question in 1.a. above, then the ***insured*** shall:
   (1) file a lawsuit, in a state or federal court that has jurisdiction, against:
   (a) us;

* * *

(Motion for Summary Judgment Exhibit "A"). According to the foregoing, two issues control whether UIM coverage is owed: (1) fault on behalf of the adverse/underinsured driver, which is not contested; and (2) extent of damages, which is. State Farm submits that Plaintiffs, through their Opposition, provided no evidence to create a genuine issue of material fact to support potential payment under the UIM provisions of the policy. Instead, the only supported/documented evidence on this issue is that contained in the exhibits submitted with State Farm's motion for summary judgment. Again, State Farm's evidence establishes: (1) a minor impact; (2) no immediate medical treatment; (3) subsequent treatment from their long-time chiropractor for soft tissue injuries; and (4) two expert opinions that Plaintiffs reached MMI as of July 1, 2007. If that were not enough, as a result of this litigation, State Farm then collected a greater universe of Plaintiffs' medical records and other information concerning their prior spine problems, their prior injuries, their prior accidents, and their post-accident events. This information was then submitted to a board certified orthopedic surgeon, Dr. Steven Sanders, for analysis in connection with his IME. Dr. Sanders concluded that Plaintiffs sustained only minor, soft tissue injuries. Dr. Sanders also concluded that the actual date he believed maximum medical improvement had been achieved before July 1, 2007. **<u>Importantly, Plaintiffs provided no rebuttal opinion or</u>**

**report from any expert to contest Dr. Sanders' findings, and certainly did not challenge those opinions in the Opposition**.

Here, Plaintiffs received over $29,000 and $22,000, respectively, for their minor neck and back strains. The medical records establish that Plaintiffs had treated for these exact conditions within months and weeks prior to the accident; that they had subsequent slips, trips, falls, and a significant high-speed crash on an icy Interstate 80, which Plaintiffs merely "brush off" as non-events. Thus, against this **uncontroverted** background State Farm reasonably concluded that Plaintiffs had been fully compensated. Therefore, given this undisputed evidence, State Farm respectfully requests this Court to grant summary judgment on Plaintiffs' UIM contract claims as well.

### E. The Controlling Issues Driving This Case Are "Fairly Debatable;"Therefore, All Extra-Contractual Claims Fail.

Plaintiffs' Opposition regarding the "bad faith" claims suffers the fatal defect addressed above – an utter absence actual evidence to establish a genuine issue of material fact. Moreover, Plaintiffs did not even address any of the controlling Wyoming law on the subject, and mentioned nothing regarding its own "bad faith" expert's actual testimony regarding the "fairly debatable" nature of the issues presented in this case. As such, this is the exact type of case where the Court should grant summary judgment, at the very least, on the extra-contractual claims.

Instead of bringing forth specific evidence to support a triable bad faith issue, Plaintiffs Opposition relies on unsupported allegations. Consider a few of the examples:

* "State Farm was of the mind to deny the claim when it retained a chiropractor, Staight, to conduct a utilization review or records review...State Farm was evaluating the claim with an eye toward denial." (Opp. p.12, lns. 11-12; 17-18).

* "It is clear that State Farm placed its interest above the interests of the insureds." (Opp. p. 16, lns. 13-14).

If State Farm was evaluating the claim with an eye toward a denial or placing its interests above the insureds, wouldn't there be evidence of that contained in the claims file or the testimony of a claims representative attached to the Opposition? If State Farm was evaluating the claim with an eye toward denial or placing its interests above its insureds, would it have still extended over $14,000 in MPC benefits to Daniel and over $7,000 to Kathleen? If State Farm was evaluating the claim with an eye

toward denial or placing its interests above its insureds, would it have sent letters to the insureds' **own treating physician** to ask when that physician believed the insureds would reach MMI? The answer to these rhetorical but critical questions, of course, is "no."

Plaintiffs then suggest that Claims Representative, Lynn Francis, was unclear or confused regarding the criteria she used in evaluating the claims. (Opp. 15, lns. 15-28) Again, this is a gross mischaracterization of her testimony. During her deposition, Ms. Francis had not been working on Wyoming claims for a number of years (since December 2007) and, for that reason, was not as familiar with the Wyoming policy as in the past. (Depo. L. Francis, attached hereto as Reply Exhibit "D", pp. 24, 26, 27, 35). Moreover, Ms. Francis accurately testified that the criteria that she used to determine payment was whether the treatment is reasonable, necessary and caused by the accident, and whether they had reached maximum medical improvement. (Reply Exhibit "D", pp. 37, 39, 44, 67-80, 100-103).[4] **That exact criteria is found in the MPC policy**. Moreover, there can be no bad faith in State Farm's decision to decline further MPC payments or UIM benefits in light of Dr. Steffensmeir's and Dr. Staight's written opinions indicating that the Plaintiffs would reach MMI as of July 1, 2007. Thus, for Plaintiffs to somehow suggest that Ms. Francis's handling was improper or somehow fell below the "fairly debatable" standard is to simply ignore the true and supported facts of this case.

To prove bad faith, "a plaintiff must show "intentional" wrongdoing or misconduct by the insurer. *Darlow v. Farmers Ins. Exchange*, 822 P.2d 820, 823-24 (Wyo. 1991), citing *McCullough v. Golden Rule Ins. Co.*, 789 P.2d 855 (Wyo. 1990) (emphasis added)(" **It is apparent, then, that the tort of bad faith is an intentional one**."). Moreover, the Wyoming Supreme Court unequivocally holds that "the appropriate standard of care to determine bad faith is the objective standard of whether or not the validity of the denied claim was **fairly debatable**." *Darlow*, 822 P.2d at 823, citing *McCullough*, 789 P. 2d at 860 (emphasis added).

Not surprisingly, Plaintiffs did not challenge or attempt to distinguish the Wyoming legal

---

[4] State Farm requests this Court to carefully read the portions of the deposition transcript of Claims Representative, L. Francis. By doing so, the Court should come to the immediate conclusion that Plaintiffs' representations regarding Ms. Francis's handling of the claim is grossly mischaracterized and sanctionable.

authority cited in State Farm's motion, including the *Wilson v. State Farm Mut. Auto. Ins. Co.*, 795 F. Supp. 1077 (D. Wyo. 1992), which seems squarely on point. Recall that in *Wilson*, a passenger, Wilson, was injured in an automobile collision with an uninsured motorist. Wilson claims that he made repeated, yet unmet demands upon State Farm for payments under the MPC and UM portions of the policy. State Farm initially paid medical bills for many months. However, State Farm decided to pay for only a portion of a neck surgery given conflicting evidence from Wilson's physicians. In concluding that summary judgment was appropriate, the court held State Farm's decision was "fairly debatable," and entered summary judgment in its favor. *Id* at 1080.

Again, the factual and legal similarities between *Wilson* and the present case are apparent. Here, it is uncontroverted that State Farm initially paid MPC payments for those bills that were related to the accident. In December 2006, approximately two and one-half months after the accident, State Farm sent a letter to Plaintiffs' treating physician, Dr. Steffensmeier, asking him to provide an update regarding Plaintiffs' condition and an expected date for MMI. Dr. Steffensmeier responded, in writing, and informed MMI would be achieved as of July 1, 2007. In March 2007, State Farm claims representative, Lynn Francis, reviewed the entire file and raised certain questions regarding apportionment and causation. As a result of those concerns, State Farm retained a qualified physician to review the Plaintiffs' records and render an opinion. As noted above, Dr. Daniel Staight's opinions were essentially the same as Dr. Steffensmeier's, i.e., that the Plaintiffs had sustained soft tissue injuries, and that they would reach MMI on July 1, 2007. Thus, after considering all of the information, State Farm declined to make further payments under the MPC for charges incurred after early August 2007 because the treatment was no longer reasonable, necessary or caused by the accident and/or essential to help them reach MMI. (Reply Exhibit "D", pp. 37, 39, 44, 67-80, 100-103). Moreover, based upon the same information, State Farm reached a similar conclusion with respect to the UIM claims, noting that Plaintiffs recovered over $29,000 and $22,000 respectively.

Indeed, these facts, just like the facts in *Wilson*, establish that State Farm had a "fairly debatable" position to decline further payments under the MPC and UIM coverage and, as a result, State Farm should be entitled to summary judgment on the bad faith claims. *Id.* This is NOT the case where a

decision to decline benefits was not done at the sole whim of an insurance adjuster; rather, the decision included the medical opinions from Plaintiffs' own treating physician and another expert, which set the date for MMI. If the foregoing does not qualify as a "fairly debatable" basis for declining further benefits, then, respectfully, nothing does.

However, this case even goes one step further than *Wilson*. Notably absent from Plaintiffs' Opposition is any reference to the actual deposition testimony of Mitch Cobeaga, the Plaintiffs' so-called "bad faith" expert. Instead, the Opposition simply refers to Mr. Cobeaga's four page report, **which was prepared without Mr. Cobeaga even having read the claim file!** Apparently, had Plaintiffs elected to use Mr. Cobeaga's actual testimony, it would have only confirmed what State Farm already pointed out – that Mr. Cobeaga is of the opinion that the key issues driving this case, i.e., the nature and extent of Plaintiffs' injuries, the date of MMI, and the value of their claims are "fairly debatable," which opinions are squarely consistent with State Farm's bad faith expert, Steven Plitt. Recall, again, these incredible admissions taken from Mr. Cobeaga's deposition testimony and cited in State Farm's motion:

* "I think that what you have is, **you have a viable defense to a claim of bad faith**."
* Yes. **I guarantee you, you could find someone. I can probably give you a list of names that might say that, yeah, they're fully compensated. I would disagree with that. But again, that's where we get into the same issue we were in before**.
* "**I think that what you have is, you have a viable defense to a claim of bad faith**. . ."

As the court recognized in *Wilson, supra*: "Wilson has the burden of proving the amount of the liability, and until he does, the amount is 'fairly debatable.'" Thus, Plaintiffs' suggestion that the "fairly debatable" inquiry only applies to the "interpretation of their contract" is at odds with Wyoming law. (Opp. p.13, lns. 17-18). Here, State Farm should be entitled to defend its timely and appropriate analysis/claims handling without being subjected to a claim of bad faith. To that end, State Farm requests that this Court grant summary judgment on all of Plaintiffs' "extra-contractual" claims.

**F. Plaintiffs Claims For Punitive Damages Should Be Dismissed As A Matter Of Law.**

Under Wyoming law, punitive damages may be awarded when an insurer breaches the duty of good faith and fair dealing. *McCullough*, 789 P.2d at 860-61. However, to award punitive damages for the intentional tort, willful and wanton misconduct must be proven. *Id.* at 861. Moreover, punitive damages can only be awarded for "conduct involving some element of outrage, similar to that usually

found in a crime." *State Farm Mut. Auto. Ins. Co. v. Shrader*, 862 P.2d 813, 836-37 (Wyo. 1994).

According to the foregoing, Plaintiffs must first establish the intentional tort of bad faith before they can even get to punitive damages. As set forth in undisputed detail herein, Plaintiffs are unable to establish bad faith noting the "fairly debatable" issues surrounding State Farm's decision to decline further payments. As such, Plaintiffs' claims for punitive damages fail on this initial level.

Moreover, even if a "bad faith" claim were able to survive this motion for summary judgment, there is absolutely no evidence to show that State Farm's conduct in this case was "outrageous" or rose to the level of "crime." *Shrader*, 862 P.2d at 836-37. Even the closest scrutiny of Plaintiffs' Opposition fails to reveal a single shred of evidence to support a punitive damage claim, i.e., that State Farm's conduct was "outrageous" or done with ill will rising to the level of a "crime." (Opp. p. 16, lns. 26 - p. 17, ln. 15.) By way of example, the Opposition merely states that Plaintiffs "possess testimony and proof which establishes malice, a conscious disregard for the rights of others and oppression in the handling of the claim which subjected the Gorrells to unjust hardship." (Opp. p.17, lns. 11-15). Indeed, if Plaintiffs truly had any such "evidence" of malice or oppression, would they not have submitted that evidence as an exhibit to their Opposition? Respectfully, Plaintiffs cannot simply recommend to the Court that it keep the punitive damage claim viable when it produces no evidence. Such a tactic violates Rule 56(e) and LR 56-1. Again, State Farm respectfully requests that the utter lack of evidence on this issue would entitle State Farm to summary judgment on the punitive damages claim.

In reality, the actual documented evidence in this case shows that State Farm did not handle the claim in an "outrageous" manner or have an ill will rising to the level of a "crime." Again, State Farm based its decision to decline further MPC payments and decline UIM recovery in light of the medical records, the property damage information, the expert opinions of Plaintiffs' and State Farm's physicians, and the amounts recovered by the Plaintiffs. If that were not enough, even Plaintiffs' own "bad faith" expert concluded that there was nothing in this case to suggest that State Farm intended to harm, e.g., "screw," the Plaintiffs, which disposes of any basis for the viability of a punitive damage claim. Therefore, because Plaintiffs did not produce any evidence to create a triable issue of punitive damages, this Court should grant summary judgment in State Farm's favor and dismiss the punitive damages

claim.

## III. CONCLUSION

Based upon the foregoing, State Farm respectfully requests that summary judgment be granted on all of Plaintiffs' claims. Or, in the alternative and at the very least, State Farm requests that partial summary judgment be granted in its favor on the "extra-contractual" claims and "punitive damages" claims.

DATED this 7th day of May, 2010.

HALL JAFFE & CLAYTON, LLP

By [signature]
RILEY A. CLAYTON
Nevada Bar No. 005260
7455 West Washington Ave., Suite 460
Las Vegas, Nevada 89128
Attorney for Defendant

## CERTIFICATE OF SERVICE

Pursuant to Rule 5(b) of the Federal Rules of Civil Procedure, I hereby certify under penalty of perjury that I am an employee of HALL JAFFE & CLAYTON, LLP, and that on the ____ day of May, 2010, the foregoing **STATE FARM'S REPLY TO PLAINTIFFS' MARCH 10, 2010, OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** was served upon the parties by filing it with this Court's e-filing and service program and by placing an original or true copy thereof in a sealed envelope, and depositing it in the U.S. Mail, postage prepaid, at Las Vegas, Nevada, addressed as follows:

Kurt K. Harris, Esq.
Harris Merritt Chapman, Ltd.
866 Seven Hills Drive, Suite 201
Henderson, Nevada 89052
*Attorney for Plaintiff*

[signature]
An Employee of
HALL JAFFE & CLAYTON, LLP